

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00333-CV

———————————————

1701 COMMERCE ACQUISITION, LLC, Appellant

V.

MACQUARIE US TRADING, LLC, Appellee

---

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-302212-18

---

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant 1701 Commerce Acquisition, LLC sued its lender, Appellee Macquarie US Trading, LLC, after Macquarie declared two events of default on Appellant's loan and began charging Appellant a default rate of interest. In two issues with multiple subparts, Appellant challenges (1) the trial court's final judgment that incorporated a prior summary-judgment ruling and that decreed that Appellant recover nothing on its suit and (2) a ruling on a motion to determine fees by which the trial court awarded approximately $1.5 million in attorneys' fees to Macquarie. We overrule the issues surrounding the defaults or do not reach them. We sustain Appellant's issue challenging Macquarie's recovery of attorneys' fees.

At the outset, we hold that Macquarie did not breach the terms of its loan agreement with Appellant or a duty of good faith and fair dealing under New York law when Macquarie declared a default based on Appellant's failure to obtain Macquarie's written consent before a subordinate mezzanine loan was prepaid. This holding obviates a need to discuss (1) the propriety of a second alleged default declared by Macquarie that resulted from Appellant's exercise of a parking-lot option and (2) the soundness of the evidence presented by Appellant to support a damage claim predicated on Macquarie's public disclosure that the loan was in default—an action that Appellant claimed devalued the property securing the loan. Next, we hold that Appellant has not adequately briefed the issue of whether Macquarie "consented"

to prepayment of the mezzanine loan and thus waived appellate review of that issue. But we do sustain one issue that Appellant raises on appeal: the loan agreement between the parties does not contain a provision that entitles Macquarie to recover its attorneys' fees and expenses in this litigation from Appellant. Accordingly, we affirm the portion of the trial court's summary judgment that Appellant take nothing on its claims against Macquarie, and we reverse the portion of the trial court's judgment awarding Macquarie its fees and expenses and render judgment that Macquarie take nothing on its fee claim.

## II. Factual and Procedural Background

### A. Factual Background

#### 1. The ownership and debt structure of Appellant

The president of Appellant is Sushil Patel, and much of the evidence that Appellant relies on was presented through his affidavit that was filed as part of Appellant's summary-judgment evidence and through his deposition. Appellant owns a Sheraton Hotel located in downtown Fort Worth. Appellant purchased the hotel out of a bankruptcy proceeding. According to Mr. Patel's affidavit, he had indirectly owned the hotel through another entity before the bankruptcy, and in the bankruptcy proceeding, the hotel was surrendered to a secured creditor in lieu of foreclosure.

The financing structure for the purchase of the hotel by Appellant involved two tiered loans: (1) a $35 million senior loan (Macquarie's Loan) made by Macquarie to Appellant; and (2) a $21 million junior loan (the Mezzanine Loan) made by DOF

3

IV Reit Holdings, LLC (which the parties refer to as Torchlight and which we will refer to as the Mezzanine Lender) to 1701 Mezzco One LLC, which is apparently Appellant's parent. Both loans were governed by lengthy loan agreements; the loan agreement governing Macquarie's Loan spans 129 single-spaced pages of text. (We will refer to Macquarie's loan agreement as the Loan Agreement and the one governing the Mezzanine Loan as the Mezzanine Loan Agreement.) In addition to the complexities created by its length, the Loan Agreement provides that it is governed by New York law, and it is that state's law that we must apply to interpret its provisions. An additional agreement overlays the Loan Agreement and the Mezzanine Loan Agreement because the relationship between the two lenders was governed by an Intercreditor Agreement, which in essence subordinated the Mezzanine Lender to Macquarie's security interests and gave Macquarie the right of first payment.

> **2.** **The alleged defaults by Appellant on the Loan Agreement that form the core of the parties' disputes and a summary of the controversies arising from those disputes**

As noted, the controversy below focused on whether two events constituted events of defaults under the Loan Agreement and justified Macquarie's action of charging a default interest rate. The applicable interest rate under the Loan Agreement was specified to be 4.828%, but because Macquarie contended that events of default had occurred, Macquarie began charging a post-default rate that increased the original interest rate by 5%. The increase in the rate caused Appellant to pay

4

approximately $1 million in additional interest before it paid off Macquarie's Loan than Appellant would have paid had the interest rate not been increased. Each party claims that the other's actions breached the Loan Agreement.

As to the event of default that Macquarie claimed because of the alleged prepayment of the Mezzanine Loan without Macquarie's written consent, this alleged default started when the Mezzanine Lender declared its loan in default by asserting that Appellant carried a balance of trade payables that exceeded the limits allowed in the Mezzanine Loan Agreement. The Mezzanine Lender made a protective advance of funds to reduce the trade payables balance below the limit allowed in the Mezzanine Loan Agreement and then increased the principal balance of its loan by the amount of its advance. The Mezzanine Lender then demanded repayment of the amount of the advance. When the advance was not paid to the satisfaction of the Mezzanine Lender, that lender accelerated its debt, declared the entire balance of the Mezzanine Loan due, and set a date for foreclosure. Appellant challenged the propriety of the Mezzanine Lender's actions. But the fraught state of affairs with the Mezzanine Lender caused Appellant to consider paying off the Mezzanine Loan.

The circumstances of the eventual payoff of the Mezzanine Loan—and whether those circumstances gave Macquarie the right to declare that an event of default had occurred and to charge a default rate of interest—generated most of the issues discussed in this opinion. The determination of whether Macquarie acted properly or instead breached the Loan Agreement by declaring a default revolves

5

around questions about (1) the communications between Appellant and Macquarie about whether Macquarie would consent to the pay off of the Mezzanine Loan, (2) what entity made the payment to discharge that loan, (3) the status of the loan when it was paid and the way in which that discharge was documented, and (4) how the Loan Agreement's terms impact whether its default provisions were triggered by the circumstances under which the Mezzanine Loan was discharged.

With respect to the communications regarding the payoff, Appellant argues that Macquarie represented that it would consent to the payoff if certain conditions were met, and Appellant contends that it satisfied those conditions. Macquarie counters that the communications referenced by Appellant demonstrate that the parties had engaged only in preliminary discussions and that questions remained that were never answered about the payoff and how the discharge of the Mezzanine Loan would affect Macquarie's position. Macquarie also highlights that Mr. Patel testified in his deposition that Macquarie never consented to a prepayment of the Mezzanine Loan.

With respect to the identity of the party that made the payment to discharge the Mezzanine Loan, the parties agree that the funds paid to discharge the Mezzanine Loan were provided by an entity named Vesta Equity, LLC, which is described in the parties' briefing as an indirect owner of the hotel. The impact of Vesta's making the payment triggers a controversy regarding whether the Loan Agreement specified that only certain parties were prohibited from making a payoff; Vesta was not listed as one of those parties.

The circumstances of the payment to discharge the Mezzanine Loan trigger two subcontroversies. The first is whether the Loan Agreement has language that alters the conventional definition of prepayment; Appellant argues that the conventional definition was not met if the Mezzanine Loan was accelerated before its payment. This question is pivotal because the parties also agree that the Mezzanine Lender had accelerated its debt before it was paid. The second is whether the way the discharge of the Mezzanine Loan was documented creates a question regarding whether that loan was paid off or simply released.

We will only briefly touch on the second default that Macquarie relied on to charge a default interest rate. This alleged default resulted from the failure of Appellant to obtain Macquarie's written consent prior to its exercise of an option to purchase a parking lot. This event of default allegedly occurred after the alleged prepayment default that was described above. We will not delve into the facts of this default because we hold that the prepayment of the Mezzanine Loan constituted an event of default and that the existence of that default independently supports the judgment entered by the trial court.

### 3. The damages that Appellant claimed that it was caused by Macquarie and the fee recovery that Macquarie obtained against Appellant

The first measure of damages that Appellant claims resulted from Macquarie's allegedly wrongful declarations of default is straightforward. Appellant seeks to

recover the amount of money it paid Macquarie as default interest, which, as we have noted, is approximately $1 million.

The second measure is bottomed in Appellant's claim that it never defaulted on Macquarie's Loan, but in its efforts to sell that loan, Macquarie publicly claimed that Appellant had done so. This damage claim is predicated on Appellant's contention that Macquarie had no right to declare Macquarie's Loan was in default and thus no right to make the public claim that a default had occurred. As Appellant conceded at oral argument, this damage claim depends on our conclusion that Appellant did not default on the Loan Agreement, or if it did, the statements that Macquarie made were accurate, and a damage claim cannot be predicated on the statements.

On the other side of the ledger, Macquarie claimed that the Loan Agreement entitled it to recover its attorneys' fees and expenses from Appellant in this litigation. Appellant disputed that the provision of the Loan Agreement that Macquarie relied on to support its fee recovery was sufficient under New York law to permit that recovery. Because the parties are at loggerheads about the relevant holdings of New York cases impacting the question and whether the Loan Agreement has a provision meeting the criteria for Macquarie to recover its fees, the fee issue is another to which this opinion will devote lengthy consideration.

## B. Procedural background

### 1. The claims and defenses pleaded by the parties

Appellant initially sued Macquarie, alleging (1) that Appellant was entitled to declaratory relief that the payment to the Mezzanine Lender and the exercise of the parking-lot option were not events of default, (2) that Macquarie had breached the Loan Agreement and the duty of good faith and fair dealing by declaring the payment and exercise of the parking-lot option to be events of default, and (3) that the breach caused damage to Appellant by requiring payment of default interest and by reducing the hotel's value. Appellant also sought various forms of injunctive relief.

After the suit was filed, the parties reached a partial settlement and executed a mutual release by which Appellant paid off Macquarie's Loan but reserved Appellant's right to pursue its litigation claims against Macquarie. After execution of the release, Appellant amended its petition to delete its claim for injunctive relief. Appellant also eventually quantified its damages as the approximately $1 million for the default interest collected by Macquarie and the approximately $15 million devaluation of the hotel by Macquarie's public statements about Appellant's alleged defaults that "tainted and severely impaired the market perception of [Appellant] and of the [h]otel and negatively impacted the terms on which [Appellant] could sell or refinance the [h]otel."

As the litigation progressed, Macquarie filed counterclaims against Appellant alleging that prepayment of the Mezzanine Loan and exercise of the parking-lot option were breaches of the Loan Agreement. The counterclaim also pleaded for the

9

recovery of Macquarie's attorneys' fees and costs. Appellant answered the counterclaim and alleged various affirmative defenses, including waiver, estoppel, and quasi-estoppel.

### 2. The motion practice that eventually resulted in a final judgment

Macquarie filed an initial motion for summary judgment, and Appellant filed a cross-motion for summary judgment—both of which the trial court denied. Macquarie then filed a second motion for summary judgment that resulted in the disposition of Appellant's claims that are on appeal. In essence, Macquarie's motion for summary judgment contended that (1) Appellant breached the Loan Agreement when, without Macquarie's written consent, the Mezzanine Loan was prepaid and the parking-lot option was exercised; (2) Macquarie had no duty of good faith and fair dealing under New York law; (3) no evidence supports Appellant's claims that Macquarie's actions damaged the value of the hotel; and (4) the claim of damage to the value of the hotel was not foreseeable when the Loan Agreement was entered into. The trial court granted Macquarie's motion generally by decreeing that "[a]fter considering Macquarie's [m]otion for [s]ummary [j]udgment, the response, the evidence, and the arguments of counsel, the [c]ourt has determined that the [m]otion is GRANTED."

After the trial court granted Macquarie's motion for summary judgment, Macquarie then filed a motion for determination of its reasonable attorneys' fees and expenses and a motion for judgment. Appellant filed a lengthy objection to

Macquarie's motion seeking attorneys' fees. The trial court granted Macquarie's fee motion and awarded it approximately $1.5 million in attorneys' fees through trial, as well as appellate fees. The trial court then signed a final judgment embodying its summary-judgment and fee rulings. Appellant filed a notice of appeal and also a first and second amended notice of appeal.

### III. Analysis

**A.     We set forth the standards of review that we apply to summary judgments and to contract construction.**

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).[1]

---

[1]Macquarie appears to have raised a no-evidence summary-judgment ground with respect to Appellant's devaluation claim. Although we usually address no-evidence summary-judgment grounds first, we may address the traditional grounds first if that approach is more efficient or if traditional grounds are dispositive in our resolution of the appeal. *Veros Credit, L.L.C. v. Sur. Bonding Co. of Am.*, No. 05-19-

11

Because many of the questions before us involve the construction of the Loan Agreement, we also set forth the standard of review for construing a contract. "The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

**B.** **We set forth the general principles of New York law that govern contract interpretation.**

As noted above, the Loan Agreement specifies that it is governed by New York law, and the parties agree that our interpretation of the Loan Agreement is governed by that state's law.[2] The Second Circuit has outlined the guiding principles of contract interpretation under New York law as follows:[3]

---

00586-CV, 2020 WL 2569911, at *4 n.3 (Tex. App.—Dallas May 21, 2020, pet. denied) (mem. op.); *Webb v. Ellis*, No. 05-19-00673-CV, 2020 WL 1983358, at *9 (Tex. App.—Dallas Apr. 27, 2020, pet. dism'd). Here, it is both more efficient to address Macquarie's traditional summary-judgment grounds first and those issues are dispositive.

[2]The Loan Agreement provides that

THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) . . . .

[3]Throughout the opinion, when a New York case appears within quoted material, we cite it as it appears in the original quotation even though many of the citations do not conform to the *Bluebook* regarding the reporter that should be cited.

12

When interpreting a contract, our "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted).

Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Law Debenture Tr*[.] *Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (internal quotation marks omitted). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract . . . ." *Howard v. Howard*, 292 A.D.2d 345, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014). Neither Appellant nor Macquarie claims that any of the provisions of the various documents that we interpret are ambiguous.

## C.    An event of default occurred by the prepayment of the Mezzanine Loan.

There is no dispute that the Mezzanine Loan was discharged. But Appellant launches a three-pronged attack on Macquarie's contention that the discharge was an event of default because it constituted a prepayment of the Mezzanine Loan without Macquarie's written consent: (1) the Mezzanine Loan had been accelerated before it

was discharged, and no provision of the Loan Agreement alters the conventional definition of prepayment, which provides that discharge of a matured obligation is not a prepayment; (2) the entity making the payment to discharge the Mezzanine Loan was not an entity prohibited from doing so by the Loan Agreement; and (3) there is a fact issue regarding whether the discharge of the Mezzanine Loan was a settlement of that obligation rather than a prepayment. We reject these arguments because (1) both the Loan Agreement and the Mezzanine Loan Agreement provide that a prepayment may occur after acceleration; (2) the Loan Agreement provides that Macquarie's consent was required for any prepayment and not just a prepayment made by a limited number of entities; and (3) the documentation of the discharge of the Mezzanine Loan described it as a payoff, and the attempt to use the testimony of Appellant's representative—that his "understanding" of the transaction was different than how it was documented—does not create a fact issue.

1. **Why we reject Appellant's argument that payment of the Mezzanine Loan after it was accelerated could not constitute a prepayment**

In the first portion of its argument under its Issue 1.a., Appellant argues that there was no prepayment of the Mezzanine Loan because it was paid after it was accelerated by the Mezzanine Lender, and thus the debt could not have been "pre"-paid because it had already matured. Appellant's argument pivots on the contentions that New York law defines prepayment as payment that occurs prior to maturity; the Loan Agreement does not provide any definition that alters the conventional

14

definition; and because the conventional definition is not altered by the agreement, there was no prepayment of the Mezzanine Loan. Macquarie counters that the conventional definition of prepayment may be altered by agreement and that the loan documents governing both its loan and the Mezzanine Loan define prepayment to include payment made after maturity; thus, Macquarie contends that the payoff of the Mezzanine Loan was a prepayment even though it occurred after acceleration of that debt. We agree with Macquarie's analysis.

> **a.** **The conventional definition of "prepayment" under New York law and how the parties' agreement may have altered that definition**

For its conventional definition of prepayment, Appellant relies on New York cases that generally provide that

> "'[p]repayment' is a payment *before* maturity. 'Acceleration' is a change in the date of maturity from the future to the present. Once the maturity date is accelerated to the present, it is no longer possible to prepay the debt before maturity. Any payment made after acceleration of the maturity date is payment made *after* maturity, not before[.']" (*Rodgers v. Rainier Nat[’l] Bank*, 111 Wash.2d 232, 237, 757 P.2d 976 [1988] [emphasis in the original]; *see*[] *also*[] *In re LHD Realty Corp.*, 726 F.2d 327, 330–331 [7th Cir. 1984]).

*Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 834 (N.Y. Sup. Ct. 2006).

But one of the very cases that Appellant cites for the conventional definition of prepayment notes that the conventional definition may be altered by agreement; the full context of a quote from a case that Appellant relies on observes that

15

[c]ontrary to the mortgagee's contention, the mortgagor's tender of payment of the entire mortgage principal plus interest to the scheduled date of closing in response to her acceleration of the debt upon default did not constitute a "prepayment" of the debt within the meaning of the prepayment clause set forth in the mortgage. *Accordingly, absent a contractual provision to the contrary,* the mortgagee was precluded from assessing a prepayment penalty (*see Kilpatrick v. Germania Life Ins. Co.*, 183 N.Y. 163, 168, 75 N.E. 1124; *3C Assoc[s]. v. IC & LP Realty Co.*, 137 A.D.2d 439, 440, 524 N.Y.S.2d 701; [*Nw.*] *Mut. Life Ins. Co. . . . ,* 11 Misc.3d 980, 985, 816 N.Y.S.2d 831; *George H. Nutman, Inc. v. Aetna Bus. Credit*, 115 Misc.2d 168, 169, 453 N.Y.S.2d 586).

*D.I.S. LLC v. Sagos*, 832 N.Y.S.2d 581, 582 (N.Y. App. Div. 2007) (emphasis added).

Macquarie, in turn, cites cases emphasizing that prepayment, in general, is subject to the definition that the parties place on it and that, in particular, a specific definition may provide that a debt paid after acceleration is still a prepayment. *SO/Bluestar, LLC v. Canarsie Hotel Corp.*, 825 N.Y.S.2d 80, 81 (N.Y. App. Div. 2006) ("Prepayment clauses will be enforced according to their terms. The Note contained an express provision providing for the payment of prepayment consideration in the event of acceleration upon default, and such a provision is enforceable[.]" (citations omitted)); *In re Fin. Ctr. Assocs. of E. Meadow, L.P.*, 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (analyzing New York case law and holding that it permitted lender to assess prepayment penalties even though it had accelerated the obligation).

> **b.    Why Appellant argues that the conventional definition of prepayment adheres and why we reject that argument**

The central pillars of Appellant's argument are apparently (1) that the Loan Agreement, though it contains twenty-eight pages of definitions, does not define

prepayment and (2) that the provisions of the Loan Agreement requiring written consent for "any prepayment or refinancing of the Mezzanine Loan" cannot mean a payment after acceleration because the Loan Agreement does not provide a definition that alters the conventional definition of the term. Thus, Appellant argues that "[b]ecause 'prepayment' is not defined in the Agreement, New York law commands that this term be given its ordinary and customary meaning and application."

The Loan Agreement specifies that an event of default occurs "if any prepayment or refinancing of the Mezzanine Loan shall occur without the prior written consent of Lender, or if Borrower shall fail to comply with any of the terms, covenants[,] and conditions of Section 4.2.21." In turn, Section 4.2.21 provides, "Except to the extent expressly permitted pursuant to the terms of this Agreement, neither Borrower, Guarantor[,] nor Mezzanine Borrower shall make any partial or full prepayments of amounts owing under the Mezzanine Loan or refinance the Mezzanine Loan without the prior written consent of Lender." It is true that neither of these sections contains an internal definition of prepayment.

But Macquarie relied on a different provision to argue that the Loan Agreement has a more tailored definition of prepayment. Section 2.3.3 of the Loan Agreement is the provision in question, and it provides that

> [i]f all or any part of the principal amount of the Loan is prepaid upon acceleration of the Loan following the occurrence of an Event of Default prior to the Permitted Prepayment Date, Borrower shall be required to pay Lender, in addition to all other amounts then payable hereunder (including, without limitation, (i) in the event that such

17

prepayment is received on a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such prepayment is received on a date other than a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which the next Monthly Payment Date occurs), together with the Exit Interest, a Spread Maintenance Premium calculated with respect to the amount of principal being repaid[,] and Breakage Costs.

Appellant does not challenge that this provision establishes that a prepayment may occur after acceleration but instead argues that it is of no aid to Macquarie because it references the prepayment of Macquarie's Loan and not that of the Mezzanine Loan. Appellant reads a great deal into the tailoring of the definition of prepayment to govern Macquarie's Loan but not a corresponding definition of prepayment of the Mezzanine Loan; Appellant argues, "In other words, if the parties knew how to define or qualify a 'prepayment' such that one may occur after acceleration, then their failure to employ that same language in the other provision must be deemed as intentional."

Macquarie responds by emphasizing that Appellant is not arguing that the language of Section 2.3.3 fails to establish that a prepayment may occur after acceleration. It then highlights that the Mezzanine Loan Agreement contains a substantially identical provision to the Loan Agreement's Section 2.3.3 in its own Section 2.3.3. In Macquarie's words, "These materially identical provisions establish that the parties contemplated a prepayment after acceleration under both the Loan Agreement and the Mezzanine Loan Agreement."

18

Macquarie also notes that other provisions of both the Loan Agreement and the Mezzanine Loan Agreement support an interpretation that a payment after acceleration constitutes a prepayment. Both loan agreements contain a Section 2.4.1. In the Mezzanine Loan Agreement, the provision reads, "Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. Borrower may, provided no Event of Default has occurred, at its option, prepay the Debt in whole but not in part, provided the following conditions are satisfied . . . ." In the Loan Agreement, the provision reads, "Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. On and after the Permitted Prepayment Date, Borrower may, provided no Event of Default has occurred, at its option, prepay the Debt in whole but not in part." By its terms, Section 2.4.1 in both loan agreements contemplates that there may be prepayment after an event of default—one consequence of which could be the acceleration of the debt.

Both agreements also contain another provision that further undermines a conclusion that the agreements contemplate that a repayment cannot occur after acceleration. Section 2.4.3 of the loan agreements provides that "[i]f after an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure[,] or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1." Again, prepayment under this provision occurs after an event of

19

default and contemplates the possibility that a foreclosure sale has occurred; a foreclosure sale presumably would occur after acceleration of the debt. Thus, the import of this provision is contrary to Appellant's argument that the Loan Agreement contemplates that a prepayment may occur only before acceleration.

In its reply brief, Appellant raises two arguments to challenge reliance on the sections of the loan agreements that Macquarie's arguments highlight. First, Appellant argues that

> [o]nly one provision in the Agreement uses the phrase "prepaid upon acceleration." Yet, again, the provisions Macquarie accuses [Appellant] of violating employ different language. Paragraph 4.2.21 refers to "partial or full prepayments[,]" and paragraph 11.1(a)(xxiii) refers to "prepayment or refinancing . . . ." Neither mentions acceleration, and that omission must mean something. "Under accepted canons of contract construction, when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional . . . ." *Sterling Inv. Servs., Inc. v. 1155 Nobo Assoc[s]., LLC*, 30 A.D.3d 579, 581 (N.Y.S.C. App. Div. 2006) (citing *U[.]S[.] Fid. & Guar. Co. v. Annunziata*, 67 N[.]Y[.]2d 2[2]9, 233 (N.Y. 1986)). [Record references omitted.]

But this argument ignores another principle of construction under New York law that we conclude is more applicable—the principle that the provisions of a contract should be harmonized. *In re AMR Corp.*, 485 B.R. 279, 303 (Bankr. S.D.N.Y. 2013) ("New York law provides that a court should construe a contract in a way that reasonably harmonizes its provisions and avoids inconsistencies."). Appellant's argument is at odds with this principle; Appellant concedes that several provisions of the Loan Agreement provide that prepayment includes payment after acceleration, but

Appellant contends that when the Loan Agreement uses the word "prepayment" without further elaboration, then it must be given a different definition. Appellant's argument fails to explain why, if the loan agreements contemplate a prepayment may occur after acceleration, a drafter would be forced to define the term every time it is used or else face a construction that it has a meaning not elsewhere used in the document.

Appellant's second argument challenges Macquarie's reliance on the provisions of the Mezzanine Loan Agreement; in Appellant's view, that agreement has no bearing on the construction of the Loan Agreement because they are separate documents between different parties. Appellant argues that "Macquarie provides no reason why a completely different contract should govern this dispute." But "[u]nder New York law, all writings forming part of a single transaction are to be read together." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). Appellant itself acknowledges that Macquarie's Loan and the Mezzanine Loan were a part of the package put together to purchase the hotel. Indeed, Macquarie and the Mezzanine Lender entered into an Intercreditor Agreement—the stated purpose of which was to coordinate the impact of the respective loan agreements:

> WHEREAS Senior Lender and Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents and the Mezzanine Loan Documents on the terms and conditions hereinbelow set forth, and to evidence certain agreements with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand and the Senior Loan and the Senior Loan Documents, on the other hand.

21

Appellant does not explain why the Loan Agreement and the Mezzanine Loan Agreement should not be read together when they were integrated together as part of the same transaction nor why there should be variant definitions of prepayment in the different loan agreements. Appellant's argument appears to be a recipe for chaos because the two loan agreements were integrated together and coordinated the right to payment but, according to Appellant, are supposed to be interpreted as having different definitions of prepayment for the Mezzanine Loan. In other words, the effect of Appellant's argument is that prepayment under the Mezzanine Loan Agreement can occur after acceleration, but it cannot under the Loan Agreement. At a more basic level, Appellant also fails to explain the logic of why Macquarie could not view the Mezzanine Loan as having been prepaid, even though the payment occurred after acceleration, when the agreement governing that loan provides that such a payment is a prepayment.

The provisions of the Loan Agreement and the Mezzanine Loan Agreement demonstrate that the parties contemplated that the early payoff of the Mezzanine Loan was a prepayment, even if that loan had been accelerated. We overrule the first portion of Appellant's argument under its Issue 1.a.

>    **2.    Why we reject Appellant's argument that the Loan Agreement did not prohibit prepayment of the Mezzanine Loan by the entity that made the payment**

In the second portion of its argument under its Issue 1.a., Appellant argues that the Loan Agreement prohibits prepayment only by certain entities and that the entity

22

that paid off the Mezzanine Loan—Vesta—is not included in that list; thus, even if the Loan Agreement prohibited a prepayment after acceleration, it did not prohibit the prepayment that occurred because the payment was not made by an entity prohibited by the Loan Agreement from making a prepayment. We disagree because the provision that Appellant references creates two alternate events of default—one of which prohibited any prepayment of the Mezzanine Loan without Macquarie's written consent.

The parties agree that the Loan Agreement's prohibition on prepayment is found in its Section 11.1(a)(xxiii), which as we have noted provides that an event of default occurs "if any prepayment or refinancing of the Mezzanine Loan shall occur without the prior written consent of Lender, *or* if Borrower shall fail to comply with any of the terms, covenants[,] and conditions of Section 4.2.21." [Emphasis added.] Again, the Section 4.2.21 referred to in the second phrase of the quoted section provides, "Except to the extent expressly permitted pursuant to the terms of this Agreement, neither Borrower, Guarantor[,] nor Mezzanine Borrower shall make any partial or full prepayments of amounts owing under the Mezzanine Loan or refinance the Mezzanine Loan without the prior written consent of Lender."

The parties agree that the party that actually paid off the Mezzanine Loan was not one of the parties listed in Section 4.2.21. To capitalize on this fact, Appellant argues that the broadly phrased first clause of Section 11.1(a)(xxiii)—"if *any* prepayment or refinancing of the Mezzanine Loan shall occur without the prior written consent of Lender"—should be read to parallel Section 4.2.21 and creates an

23

event of default only if the prepayment is made by one of the entities listed in the latter section. [Emphasis added.]

Macquarie counters that Appellant's interpretation ignores the disjunctive structure of Section 11.1(a)(xxiii), which creates two distinct events of default—one of which is an all-encompassing prepayment of the Mezzanine Loan without its consent. Again, we must adhere to the terms of the document as written, and Macquarie's interpretation is more faithful to the Loan Agreement's terms.

Macquarie presents a straightforward interpretation of the default provision:

> [Section] 11.1(a)(xxiii) states that *any* prepayment without Macquarie's prior written consent constitutes an Event of Default. Although this section also prohibits any violation of [Section] 4.2.21, it is not limited to such violations. The prohibition on "any prepayment or refinancing" is in a separate phrase from the prohibition related to . . . [Section] 4.2.21[,] and these phrases are separated by an "or," indicating that either one of them separately constitutes an event of default. The use of the modifier "any" further confirms that *all* prepayments required Macquarie's prior written consent. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'"); *Zanghi v. Greyhound Lines, Inc.*, 651 N.Y.S.2d 833, 834–35 (N.Y. App. Div. 1996) (separate categories "disjunctively joined by 'or'" were "separate alternatives"). [Record references omitted.]

The cases that Macquarie cites for the power of the disjunctive deal with statutory interpretation. New York cases dealing with contract interpretation vest the disjunctive with the same power. For example, a New York federal district court dealt with the question of whether a concrete slab had to meet two tests or only one test for the levelness specified in a contract. *See Pioneer Valley Concrete Serv., Inc. v. JAG I, LLC*, No. 1:10-CV-1311, 2013 WL 6230105, at *13 (N.D.N.Y. Dec. 2, 2013) (mem.

24

decision and order). One party argued that even though the two tests of levelness were separated by the disjunctive, the slab's levelness had to meet both tests' standards. *Id.* The court summarized the argument made and the authority establishing that the use of the disjunctive was an unambiguous signal that the phrases were freestanding alternatives:

> Plaintiff argues that the use of the word "or" in the Gymnasium Floor Specs should be interpreted to mean "and." Thus, Plaintiff argues, Pioneer was obligated to Whiting–Turner, and JAG was obligated to Pioneer, to place and finish the Gymnasium Floors such that they met both the F-number and 10' straightedge tests [for levelness]. The plain terms of the contract do not support such an interpretation.
>
> The Court finds the terms of the Gymnasium Floor Specs to be unambiguous. Accordingly, the Court need not go outside the four corners of the contract to understand its meaning. Contrary to Plaintiff's position, the Court finds as a matter of law that Pioneer's obligation to Whiting–Turner, and by extension JAG's obligation to Pioneer, could be satisfied by placing and finishing Gymnasium Floors that met either the F-number *or* 10' straightedge test. *See Del Global Tech[s.] Corp. v. Park*, No. 03 Civ. 8867, 2008 WL 5329963, *4 (S.D.N.Y. Dec. 15, 2008) (holding that the second clause in a contract provision which was introduced by the disjunctive "or" indicates an alternative event and could satisfy a condition independent of the first clause); *Portside Growth [&] Opportunity Fund v. Gigabeam Corp. . . . ,* 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008) (observing that "[f]or [defendant] to prevail . . . the contested language must override the ordinary presumption that the term 'or' expresses an alternative" and explaining "that 'or' is a disjunctive particle used to express an alternative or to give a choice of one or among two or more things") (citations and quotations omitted); *Cresvale Int'l v. Reuters Am., Inc.*, 257 A.D.2d 502, 684 N.Y.S.2d 219, 222 (1st Dept. 1999) (holding that words in a contract clause stated in the disjunctive must be considered separately (citing *Coutu v. Exch. Ins. Co.,* 174 A.D.2d 241, 579 N.Y.S.2d 751, 752 (1st Dept. 1992)); *cf. Progressive [Ne.] Ins. Co. v. State Farm Ins. [Cos.]*, 81 A.D.3d 1376, 916 N.Y.S.2d 454, 456–57 (4th Dept. 2011) (holding that "[i]nterpreting [contract] language in the manner urged by [defendant] effectively turn[ed] the conjunctive

25

'and' into a disjunctive 'or' " which was unsupported by "[t]he structure of the sentence" and contrary to the "plain language of the sentence as it would be understood by an average or ordinary citizen").

*Id.*

Thus, giving the disjunctive the power that it commands, Section 11.1(a)(xxiii) offers two alternative events of default:

- if any prepayment or refinancing of the Mezzanine Loan shall occur without the prior written consent of Lender

  *or*

- if Borrower shall fail to comply with any of the terms, covenants, and conditions of Section 4.2.21.

Based on our holding above, there was a prepayment of the Mezzanine Loan, and the prepayment triggered a default under the first alternative phrase.

Appellant tries to sidestep the presence of the two coequal alternatives created by Section 11.1(a)(xxiii)'s use of the disjunctive by arguing (1) that the two alternatives are inconsistent, so we must prioritize what Appellant argues is the more specific phrase referring to Section 4.2.21, and (2) that not adopting this approach will render Section 4.2.21 superfluous. To read into the Loan Agreement the inconsistency that Appellant sees requires an interpretation that it was the parties' intent that only a prepayment by the entities specified in Section 4.2.21 could trigger a default, but that is simply not what the document provides. We have no idea what the parties'

subjective intent was in creating the belt-and-suspenders approach evidenced by the two alternative phrases of Section 11.1(a)(xxiii) and need not delve into the parties' intent in view of the language utilized because no one argues that the language is ambiguous, nor do we think that it is. Indeed, at various points in its brief and in the summary-judgment record, Appellant touts the sophistication of its principals and the caliber of the law firms negotiating the Agreement.[4] One result of these negotiations was a clause written in plain language that set as one of the alternative events of default any prepayment of the Mezzanine Loan without Macquarie's written consent.

We overrule the second portion of Appellant's argument under its Issue 1.a.

### 3. Why we reject Appellant's argument that a fact issue exists because discharge of the Mezzanine Loan was a settlement rather than a payoff

Appellant's final challenge under its Issue 1.a. is to the characterization of the discharge of the Mezzanine Loan as a prepayment because it was not a payoff of that loan but rather a termination of that loan to settle a prelitigation dispute. We reject this argument because it is contrary to the terms of the document implementing the discharge; that document characterizes the payment as a payoff.

To give the discharge of the Mezzanine Loan the gloss of a "settlement," Appellant relies on the "understanding or belief" of how the transaction should be

---

[4]When dealing with another issue, Appellant highlights that "[h]ere, even though the Agreement extends to some 129 single-spaced pages [of text] and was entered into by sophisticated parties employing highly capable law firms, the Agreement contains no attorney-fee provision at all."

27

characterized as contained in the affidavit of its representative, Mr. Patel. The affidavit states the following:

> It was not the understanding or belief of me or of [Appellant] that the Mezzanine Transfer was a payment of the Mezzanine Loan. Rather, both [Appellant] and the Mezzanine Lender made legal allegations and threatened legal action, there were multiple and substantial disputes as to whether there was a default and whether the Mezzanine Lender's calculation of $30,175,559.48 as a loan payoff was correct, [Appellant] had threatened to file bankruptcy to stop the foreclosure, and the issues became not amounts owing on a promissory note[] but contested legal rights and legal damages. It is in this context that the Mezzanine Transfer occurred[] and that the parties entered into the settlement agreement included as Exhibit E, which agreement does not reference any payment[] but rather speaks in terms of settlement, exhaustion [of] rights, and termination of the Mezzanine Loan.

Relying on this paragraph's "understanding or belief" of how the discharge of the Mezzanine Loan should be characterized, Appellant argues, "Thus, the payment by Vesta Equity to the Mezzanine Lender was a payment to settle complicated and hotly disputed legal rights, and the Mezzanine Loan was terminated, not *paid off*." [Emphasis added.]

But the very document that Appellant points us to describes the payment that was made to discharge the Mezzanine Loan as a "payoff." In fact, the very page of the record that Appellant's brief refers us to—the first page of the document referencing the discharge of the debt—characterizes the payment as follows:

> Lender has been asked to accept a discounted payoff amount with respect to the Loan (hereinafter referred to as the "***Discounted Payoff Amount***"). The Discounted Payoff Amount for a discounted payoff of the Loan on or before March 23, 2018[,] is $28,575,000.00. Borrower

28

shall pay the Discounted Payoff Amount in accordance with the wire instructions set forth below.

A summary-judgment affidavit that attempts to gloss over and contradict the terms of the very document to which it refers transgresses a host of rules governing what constitutes admissible summary-judgment evidence. The parol-evidence rule prevents a party from relying on summary-judgment evidence that varies or contradicts a written document. *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 511 (Tex. App.—Fort Worth 2012, no pet.). A person's subjective beliefs are not competent summary-judgment evidence. *Krishnan v. Law Offs. of Preston Henrichson, P.C.*, 83 S.W.3d 295, 299 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied) ("Statements of subjective belief are no more than conclusions and are not competent summary[-]judgment evidence.") (citing *Tex. Div.–Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994)). Nor do legal conclusions constitute competent summary-judgment evidence. *Johnson v. Dunham*, No. 11-20-00123-CV, 2022 WL 969516, at *8 (Tex. App.—Eastland Mar. 31, 2022, no pet.) (mem. op.) (citing *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984)).

At bottom, the "understanding or belief" that Appellant offers to recharacterize the nature of the payment made to discharge the Mezzanine Loan is unavailing when it stands in contradiction to the terms of the document that conveyed and characterized that payment. We overrule Appellant's last argument under its Issue 1.a. and thus overrule Issue 1.a. in its entirety.

**D. Because of our disposition of Appellant's Issue 1.a., we do not reach its Issue 1.b.**

Appellant's Issue 1.b. challenges Macquarie's actions of declaring the loan to be in default and charging the default rate of interest because Appellant allegedly exercised a parking-lot option with Macquarie's written consent. This alleged event of default occurred after the prepayment default that we have already addressed, and Macquarie was already charging the default rate of interest before the alleged second default occurred. Thus, we have concluded that a default occurred that supported the charging of default interest for the full period that it was charged. This conclusion supports the trial court's judgment that Macquarie did not breach the Loan Agreement by charging default interest. Therefore, we do not reach the question of the propriety of Macquarie's actions in declaring the loan in default based on the failure of Appellant to obtain written consent before allegedly exercising the parking-lot option.[5]

---

[5]We also do not reach Appellant's arguments made without support of an issue that the trial court improperly accepted Macquarie's challenges to its damage model; those arguments claimed that Macquarie's publication of its invalid claims that Macquarie's Loan was in default devalued the hotel property owned by Appellant. This claim appears to be pleaded as a measure of damage associated with the breach-of-contract claim by improperly declaring an event of default. Specifically, Appellant pleaded that

> upon information and belief, [Macquarie] has recently attempted to sell its loan. In the process, [Macquarie] (through its agent) prepared a flyer, which it caused to be transmitted to many brokers, buyers, lenders, and other participants in the hotel industry. *In that flyer, [Macquarie] (through its agent) falsely claimed that the loan was in default, and [Macquarie] referenced the default interest now being charged as a "premium."* This caused further damage to [Appellant] by way of a loss of value of the [h]otel, damage that was

30

**E.    Appellant has waived its issue on appeal that Macquarie consented to the prepayment of the Mezzanine Loan.**

In its Issue 1.c., Appellant argues that "Macquarie's consent precluded summary judgment." But Appellant does not challenge that the Loan Agreement required written consent to the prepayment of the Mezzanine Loan.[6] Appellant's brief never tells us what legal defense prevented Macquarie from forgoing its contractual right to require written consent, what the elements are for that defense, or how its summary-judgment evidence met the required standard. Appellant has waived any such complaint on appeal.

foreseeable by [Macquarie], that was intended by [Macquarie], and that was proximately caused by [Macquarie]. Namely, even as [Appellant] was about to market the [h]otel for a potential sale, [Macquarie] created an impression in the market that the loan was in default, leading to a belief that [Appellant] may be more desperate to sell the [h]otel, leading to a lower value due to the false market impression caused by [Macquarie]. [Emphasis added.]

Also, during oral argument, Appellant's counsel conceded that Appellant was not bringing a freestanding trade disparagement claim because of Macquarie's statements. Because the devaluation claim was predicated on the claim that Macquarie improperly declared the loan in default and because we have held that the loan was in default, we do not reach the challenges related to a damage model that presumed there was a breach of contract.

Also as a result of our holding, we need not reach Appellant's alternative issues on whether Mr. Patel was a credible witness and whether the payments made by Appellant were voluntary. With respect to Appellant's arguments regarding whether one party was attempting to smear another, those arguments are irrelevant based on our legal rulings that are predicated on our construction of the loan agreements.

[6]The Loan Agreement required any modifications or waivers to be in writing (Section 12.4) and required all notice under the agreement to be in writing (Section 12.6).

31

Based on our holdings and the summary-judgment record, two matters are no longer in dispute: (1) the Loan Agreement provides that it is an event of default "if any prepayment or refinancing of the Mezzanine Loan shall occur without the prior written consent of the Lender," and (2) Macquarie never gave written consent for the prepayment at issue. In response to Macquarie's counterclaim asserting that prepayment of the Mezzanine Loan constituted a breach of contract, Appellant pleaded—without elaboration—that "[Appellant] asserts that [Macquarie's] counterclaims are barred by waiver, estoppel, and/or quasi-estoppel." In its response to Macquarie's motion for summary judgment, Appellant argued that Macquarie "consented" to prepayment, even though there was no written consent, and Appellant specifically relied on the defenses of estoppel and oral modification of the contract.

Appellant's brief asserts that Macquarie "consented" to the prepayment but then cites only a smattering of sentences from Mr. Patel's affidavit; Appellant does not cite any cases or even reference a legal theory that allowed it to avoid the requirement of written consent.[7] Appellant's reply brief is no more enlightening when

[7]The substance of Appellant's briefing on this issue is as follows:

For the alleged "prepayment," the summary[-]judgment record includes evidence that Macquarie set forth the conditions [that Appellant] needed to satisfy to obtain Macquarie's consent. Mr. Patel testified[,]

Macquarie indicated and represented to me . . . that it would consent to a payoff of the Mezzanine Loan, provided that the funds to make such payment did not come from [Appellant] (which they did not), provided that

it argues that Macquarie's brief improperly invokes the sham-affidavit doctrine to challenge Mr. Patel's affidavit and leaves it at that—again, not even referencing what defense Appellant relied on or citing any authority to guide us in determining whether a fact issue was raised on the defense, whatever it might be.

Procedurally, if Appellant were attempting to raise an affirmative defense to thwart the Loan Agreement's requirement of written consent, Appellant bore the burden to establish that a fact issue existed on each element of that defense:

---

> the funds would not be in the form of additional debt against the [h]otel (which they were not), and provided that there would be no change in control which might jeopardize the franchise, the liquor license, or [h]otel operations (which there was not).

Mr. Patel continued, "Ultimately, [Appellant] satisfied each requirement that Macquarie set forth as a condition for obtaining its consent." For the avoidance of doubt[,]

> None of the funds used to make the Mezzanine Transfer came from funds or property of [Appellant] or any affiliate, or from any entity that was obligated on or had guaranteed [Appellant]'s obligations to Macquarie. None of the funds used to make the Mezzanine Transfer came from Macquarie's collateral[] or the proceeds of its collateral. The funds came in as pure equity, and not as debt against [Appellant], any other obligor or guarantor, the property of [Appellant] or any other obligor or guarantor, or anyone else.

> The documentary evidence backs up Mr. Patel's testimony. The wire receipt shows the funds came [from] an entity known as Vesta Equity, LLC. As Mr. Patel explained, Vesta was one of [Appellant]'s indirect equity owners. [Record references omitted.]

33

> If, as here, the non[]movant relies on an affirmative defense to oppose the summary[-]judgment motion, he must provide sufficient summary[-]judgment evidence to create a fact issue on each element of the defense. *See Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). The non[]movant is not required to prove the affirmative defense as a matter of law; raising a fact issue is sufficient to defeat summary judgment. *See Brownlee*, 665 S.W.2d at 112; *Anglo–Dutch Petroleum*, 193 S.W.3d at 95.

*Tello v. Bank One, N.A.*, 218 S.W.3d 109, 114 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

The parties' summary-judgment briefing contains a host of arguments and counter-arguments regarding whether consent occurred or why New York law did or did not permit a waiver of the written-consent requirement. The arguments even include a citation to a provision of the New York General Obligation Law that allegedly prohibited any attempt to orally modify the written-consent requirement. Appellant's brief leaves it to us to unearth what legal doctrines the parties invoked, to determine the elements and parameters of those doctrines, and then to formulate how the evidence interacts with those elements. The superficial treatment that Appellant gives the consent issue does not constitute proper briefing. *See* Tex. R. App. P. 38.1(f), (h), (i).

A concurring opinion from the Dallas Court of Appeals has outlined what constitutes proper briefing as follows:

> An appellant has the burden to present and discuss his assertions of error in compliance with the appellate briefing rules. *Amir-Sharif v. Tex. Dep't of Fam*[.] *& Protective Servs.*, No. 05-13-00958-CV, 2015 WL

34

4967239, at *2 (Tex. App.—Dallas Aug. 20, 2015, pet. denied) (mem. op.); *Ayati-Ghaffari v. Gumbodete*, No. 05-14-01019-CV, 2015 WL 4482158, at *3 (Tex. App.—Dallas July 23, 2015, no pet.) (mem. op.); *Cruz v. Van Sickle*, 452 S.W.3d 503, 511 (Tex. App.—Dallas 2014, [pets. denied]). The Texas Rules of Appellate Procedure have specific requirements for briefing. Tex. R. App. P. 38; *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.). These rules require appellants to state their complaint concisely; to provide understandable, succinct, and clear argument for why their complaint has merit in fact and in law; and to cite and apply law that is applicable to their complaint along with record references that are appropriate. Tex. R. App. P. 38.1(f), (h), (i); *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018); *see also Bolling*, 315 S.W.3d at 895. This requirement is not satisfied by merely making brief, conclusory statements unsupported by legal citations. *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.). And references to sweeping statements of general law are rarely appropriate. *Bolling*, 315 S.W.3d at 896.

*Eco Planet, LLC v. ANT Trading*, No. 05-19-00239-CV, 2020 WL 6707561, at *5 (Tex. App.—Dallas Nov. 16, 2020, pet. denied) (mem. op.) (Osborne, J., concurring).

Further, we have previously noted why we cannot take on the role of briefing a party's argument for it:

> [W]e do not and cannot assume the responsibility of doing the parties' briefing for them. Our role is to review the arguments made and dispose of the appeals; we cannot search the record and research the law to formulate parties' arguments for them. *See* Tex. R. App. P. 38.1(i); *see also Bolling*, 315 S.W.3d at 895. Simply put, we are not advocates for any of the parties. *Jones v. Am. Real Estate Inv.*, No. 05-19-00546-CV, 2020 WL 5834301, at *1 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op.).

*De Los Reyes v. Maris*, No. 02-21-00022-CV, 2021 WL 5227179, at *9 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.).

35

As we have noted, Appellant's argument does not even tell us which legal theory underpins its argument and would leave it to us to analyze another state's law and then formulate arguments from our research. We will not take on that role.

At times, we will accord a party an opportunity to rebrief after it has filed a deficient brief. Here, we will not order rebriefing because Appellant has already had an opportunity to correct its briefing deficiency. *See id.* at *8. Macquarie's brief points out that "[Appellant] has not raised any legal basis to relieve itself of the prior[-]written[-]consent obligation, and any such arguments are therefore waived." Even when faced with Macquarie's challenge, Appellant's reply brief still failed to address what theory or authority supports its position. Instead, it focused on Macquarie's contention that Appellant's representative's affidavit is a sham. After being accorded an opportunity in its reply brief to support its argument with legal argument and citations and after being warned by the opposing party of the deficiency in its briefing, Appellant still failed to brief its issue adequately. In the face of this situation, we see no need to accord Appellant an additional opportunity to remedy its deficient briefing.[8]

---

[8]Macquarie's argument—that Mr. Patel's affidavit is a sham because in it he contends that Macquarie had consented—centers on the fact that Mr. Patel had answered no when asked at his deposition, "Did Macquarie ever consent to any payoff of the [M]ezzanine [L]oan?" Macquarie also notes that the email that it argues Mr. Patel was referring to in his affidavit clearly showed that Macquarie was not stating that if certain conditions were met, it would consent. But Mr. Patel appears to have testified that he was relying on another email, though he had not reviewed the email before his deposition, could not state when he had last read the email, and could

We overrule Appellant's Issue 1.c.

**F.  We reject Appellant's argument that the Loan Agreement imposed a duty of good faith and fair dealing on Macquarie.**

In its Issue 1.d., Appellant argues that Macquarie violated the duty of good faith and fair dealing that exists under New York law by declaring an event of default. We disagree.  Though the duty is generally implied in all contracts, it is not imposed when to do so would be contrary to the terms of the parties' contract.  As explained more fully below, a contract that gives a party sole and complete discretion to implement a contractual provision negates the duty, though that rule is tempered in limited circumstances if the exercise of discretion deprives a party of the fruits of a contract and makes the performance it was promised illusory.

Here, the provisions governing Macquarie's decision to refuse its consent to matters such as prepayment vested it with sole discretion and made its decision with regard to that discretion final and conclusive.  And other than a passing reference to the principle, Appellant does not argue that it would be deprived of the fruits of the Loan Agreement unless the duty of good faith and fair dealing were imposed on Macquarie.  Indeed, Macquarie did perform by providing the financing that the Loan Agreement promised, and to impose the duty in the face of the provision giving Macquarie broad discretion would negate that very provision.  Thus, we conclude that

not remember all of its statements.  To further complicate matters, Appellant's counsel seemed to acknowledge during the summary-judgment argument that the email that Macquarie refers to is the email that Mr. Patel mentioned.  Because of our holding, we need not sort out whether Mr. Patel's affidavit is a sham.

37

New York law did not impose a duty of good faith and fair dealing on Macquarie when it did not consent to the prepayment of the Mezzanine Loan.

> **1.  We explain the principles of New York law on the duty of good faith and fair dealing and how a contract may abrogate the existence of that duty.**

Undoubtedly, New York applies a general duty of good faith and fair dealing to contractual relations. As a summary of New York law on the scope of the duty, we quote extensively from the recent federal district court decisions of *Southern Telecom Inc. v. ThreeSixty Brands Group, LLC*, No. 20-CV-2151 (LJL), 520 F. Supp. 3d 497 (S.D.N.Y. Feb. 17, 2021) (corrected order and opinion), and *Goureau v. Lemonis*, No. 1:20-CV-04691, 2021 WL 4847073 (S.D.N.Y. Oct. 15, 2021) (order granting in part motion to reconsider).

*ThreeSixty* provided the following overview of the origin of the duty of good faith and fair dealing, its purpose, and how it cannot be imposed when that doctrine's application operates inconsistently with a contractual provision:

> "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)). "'This covenant embraces a pledge that neither party shall do anything [that] will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131, 135, 773 N.E.2d 496 (2002)). "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (1983). Accordingly, "[n]o obligation can be implied . . .

[that] would be inconsistent with other terms of the agreement of the parties." *Id.*

520 F. Supp. 3d at 504.

*Goureau* noted New York's highest court's application of the duty to a contract that gives a party discretion over the invocation of a contractual provision:

> The New York Court of Appeals has suggested that a contract provision granting discretionary authority to one party may be subject to the implied covenant of good faith and fair dealing. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 396, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) ("To be sure, there is a covenant of good faith and fair dealing implicit in [a] contract [that involves discretionary functions].").  Relying on this guidance, courts have ruled that where a contract clause imbued in a party the discretion to take some action, the implied covenant of good faith and fair dealing could adhere to require that the action taken be exercised in a way that was not arbitrary or irrational. *See, e.g., Maddaloni Jew[e]lers, Inc. v. Rolex Watch U.S.A., Inc.*, 41 A.D.3d 269, 838 N.Y.S.2d 536 (1st Dep't 2007).

2021 WL 4847073, at \*6.

*Goureau* then went on to describe how the terms of the contract may delimit the scope of the duty and how a contract may vest a party with such a degree of discretion that it abrogates a duty to act in good faith.  Again, we quote *Goureau*'s analysis of New York law:

> However, the New York Court of Appeals in *Moran v. E[r]k* provided further guidance [on the scope of the duty of good faith and fair dealing].  In *Moran*, the Court of Appeals ruled that a contingent approval clause in a real estate contract did not implicate the implied covenant of good faith and fair dealing.  11 N.Y.3d 452, 458–59, 872 N.Y.S.2d 696, 901 N.E.2d 187.  The *Moran* Court looked to the plain meaning of the at-issue contract provision and found that where no limitation was placed on the contingent approval as part of the bargained-for language, the implied covenant of good faith and fair

39

dealing did not attach. *Id.* at 459, 872 N.Y.S.2d 696, 901 N.E.2d 187. Subsequently, Courts in this district and New York have applied *Moran* and its logic broadly to discretionary clauses in contracts. *See Stokes v. Lusker*, 2009 U.S. Dist. LEXIS 23471, 2009 WL 612336, at *8 (S.D.N.Y. Mar. 4, 2009) ("[A] discretionary contingency clause does not carry with it an implied duty of good faith, unless it was explicitly part of the bargain."); *Paxi, LLC v. Shiseido Ams. Corp.*, 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009) ("[T]he obligation of good faith and fair dealing does not negate an expressly bargained-for clause that allows a party to exercise its discretion, unless that clause imposes a limit on the discretion to be exercised or explicitly states that the duty of good faith and fair dealing applies."); *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. [2d] 322, 334 (S.D.N.Y. 2010).

Subsequent to *Moran*, state courts applying New York law have also refused to recognize a claim for breach of the implied covenant of good faith and fair dealing where the contract entitles one party to exercise complete and sole discretion with respect to the complained[-]of actions. *Cambridge Invs. LLC v. Prophecy Asset Mgt., LP*, 188 A.D.3d 521, 522, 132 N.Y.S.3d 622 (1st Dep't 2020) ("Defendant cannot breach the covenant of good faith and fair dealing if the contract gives it sole and complete discretion."); *Transit Funding Assoc., LLC v. Capital One Equip. Fin. Corp.*, 149 A.D.3d 23, 29–30, 48 N.Y.S.3d 110 (1st Dep't 2017) (covenant of good faith and fair dealing cannot negate express provision of contract); *ELBT Realty, LLC v. Mineola Garden City Co.*, 144 A.D.3d 1083, 1084, 42 N.Y.S.3d 304 (2d Dep't 2016) (rejecting implied covenant argument where plain language of contract gave termination discretion to defendant in "its sole discretion.").

*Id.* at *6–7. Because the contract provision under examination in *Goureau* permitted certain actions in the sole discretion of the party exercising the right under the provision, no claim lay that the party exercising the right had to do so in good faith. *Id.* at *7.[9]

---

[9]Appellant cites a case that it argues stands for the proposition "that the duty [of good faith and fair dealing] can be disclaimed 'only . . . by a specific reference to the duty of good faith and fair dealing.'" *See Akal Taxi NYC LLC v. City of N.Y.*, No. 708602/2017, 2020 WL 2066396 (N.Y. Sup. Ct. Mar. 16, 2020). As Macquarie points out, the language that Appellant cites is not a holding of the court but a

But turning back to *ThreeSixty*, the court did not read the seminal *Moran* opinion that *Goureau* cited to completely insulate a party from a claim of breach of duty of good faith and fair dealing even though a contractual provision vested a party with the sole discretion to make a decision. In *ThreeSixty*'s view, *Moran* required a more subtle and expansive analysis:

> Rather, *Moran* requires the court to use the law applicable in all contract cases to determine the meaning of a contract term and then, after looking at both that term in isolation and the contract as a whole, to decide (1) whether the covenant would negate the terms of the bargained-for clause; and (2) if not, whether application of the covenant is necessary to preserve the fruits of the contract and prevent it from being illusory. The two questions are related. Courts presume that parties do not make empty promises. When the implication of a duty of good faith and fair dealing would be inconsistent with the language of a provision of a contract and is not necessary to make the agreement meaningful, the court will not invoke the covenant. But where, by contrast, it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory—in the words of the cases, where necessary so as not to deprive a contracting party of the "fruits of the contract"—the courts will not hesitate to infer an obligation to act in good faith. A licensee granted the exclusive rights to sell the licensor's products, for example, cannot automatically relieve itself of the obligation to exercise that contractual right in good faith by the simple expedient of adding the language "sole discretion," if the failure to act in good faith would render the contract illusory. *See Advanced Water Techs. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 319–21 (S.D.N.Y. 2020). That is what was meant when Judge Cardozo long ago spoke of a contract right as being "instinct with an obligation." *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214, 214 (1917). No magic words can *ipso*

description of an argument made by the plaintiff in the case. And here, we are not dealing with a boilerplate disclaimer of the duty but a contractual provision granting Macquarie exclusive discretion to make a decision. The cases that we have cited make clear that a provision vesting a party with this level of discretion may disable a claim for the breach of the duty.

41

*facto* and without review of the contract as a whole relieve a contracting party of that obligation.

*ThreeSixty*, 520 F. Supp. 3d at 507.

Thus, we glean the following from the quotations provided from *Goureau* and *ThreeSixty*:

- New York applies the duty of good faith and fair dealing to contracts;

- The duty applies when a contract gives a party discretion in performing a duty under a contractual provision;

- Vesting a party with the sole discretion or a similar scope of discretion negates the existence of the duty; and

- The duty may still exist, even in the face of a provision vesting a party with sole discretion, but to apply the duty in the face of such a provision requires a two-pronged analysis of (1) whether the application of the duty negates the bargained-for discretion that the contractual provision provides and (2) should the analysis indicate that the duty does not negate the bargained-for right, whether application of the duty is necessary "to preserve the fruits of the contract and prevent it from being illusory." *ThreeSixty*, 520 F. Supp. 3d at 507.

**2.** **We describe the provisions of the Loan Agreement affecting the Lender's consent to the approval of prepayment of the Mezzanine Loan.**

We have already discussed in detail why we conclude that there was a prepayment of the Mezzanine Loan as prepayment is defined in the Loan Agreement and why the prepayment—structured as it was—triggered a default of the Loan Agreement because there was no prior written consent to make the payment.

The question of whether a duty of good faith and fair dealing impacted Macquarie's ability to declare a default turns on the scope of the following provision that both parties agree should be the primary focus of our analysis:

> **Section 12.2** **Lender's Discretion.** Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory, based upon Lender's determination of Rating Agency criteria, shall be substituted therefore.

**3.** **We conclude that the Loan Agreement negates the existence of the duty of good faith and fair dealing.**

The parties agree that the existence of a claim for the breach of the duty of good faith and fair dealing turns on an interpretation of Section 12.2. On its face, this provision is broad enough to embrace the question of prepayment with its language

43

stating that when the "Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender . . . shall . . . be in the sole discretion of Lender and shall be final and conclusive." The only argument that Appellant musters regarding why the provision should not negate the duty of good faith and fair dealing for consent to prepayment of the Mezzanine Loan is that other sections of the Loan Agreement grant Macquarie sole and "absolute" discretion to take specific acts. From this, Appellant draws the argument that

> [c]learly Macquarie knew how to draft the Agreement so as to give it "absolute" discretion for certain things, yet the absence of such a provision for approving any alleged "prepayment" or "exercise" of the parking[-]lot [o]ption demonstrates that Macquarie's discretion with respect to those issues was not absolute and, therefore, was subject to the duty of good faith and fair dealing[,] *i.e.*[,] "not to act arbitrarily or irrationally in exercising that discretion."

The argument begs the question of whether the level of discretion that Section 12.2 vests in Macquarie is sufficient to negate a duty of good faith and fair dealing when it decided whether to consent to prepayment of the Mezzanine Loan. It is.

Appellant also tries to cabin the language of Section 12.2 by arguing that its reference to "sole discretion" is not sufficient to grant Macquarie sufficient discretion to overcome a claim of breach of the duty of good faith and fair dealing. Appellant pitches its argument as follows: "That any discretion is solely that of Macquarie is not in dispute. But 'sole' discretion means just that; that any discretion is that of Macquarie's and Macquarie's alone. But that is an issue completely separate from the

44

*scope* of that discretion and whether that discretion is absolute." There are two flaws in this argument. First, *Goureau* cites to *ELBT Realty*, 42 N.Y.S.3d at 306, in which a New York court rejected an "implied[-]covenant argument where [the] plain language of [the] contract gave termination discretion to [the] defendant in 'its sole discretion.'" 2021 WL 4847073, at *7.

And second, as Macquarie points out, Section 12.2 goes beyond granting it sole discretion and also provides that the discretion it exercises "shall be final and conclusive." Macquarie notes "final and conclusive" carries a meaning of terminal and unappealable. *Final*, Black's Law Dictionary (11th ed. 2019). Conclusive carries the meaning of authoritative; decisive; convincing. *Conclusive*, Black's Law Dictionary (11th ed. 2019). Thus, Section 12.2 goes beyond stating that Macquarie acts with sole discretion and augments the provision with language that makes its decision the last word on the subject.

Undeterred by the breadth of the language giving Macquarie final and conclusive discretion, Appellant argues in its reply brief that the failure to use the word "absolute" in Section 12.2 when other sections of the Loan Agreement specifically provided that the Lender had absolute discretion impacts the analysis because different words have different meanings and because the Lender used absolute in some sections of the agreement and "final and conclusive" in Section 12.2, that difference must have some significance. In Appellant's view, "[g]iven the omission of the word 'absolute,' one cannot escape the conclusion that Macquarie

45

enjoyed less-than-absolute discretion under ¶ 12.2 of the Agreement." Of course, this argument ignores that different words can carry the same meaning. Indeed, one definition that *Black's Law Dictionary* gives of the word "absolute" uses one of the words found in Section 12.2 with its definition of absolute as "*conclusive* and not liable to revision." *Absolute*, Black's Law Dictionary (11th ed. 2019) (emphasis added). For this reason, we reject Appellant's attempt to water down the degree of discretion vested in Macquarie because Section 12.2 has language that is different than other sections of the Loan Agreement when it uses words granting Macquarie unbridled discretion—a degree of discretion that usually negates the duty of good faith and fair dealing.

Next, we turn to *ThreeSixty*'s discussion of New York's seminal opinion of *Moran* and its holding that the duty of good faith and fair dealing may exist even in the face of a provision granting a party sole discretion to make a decision. 520 F. Supp. 3d at 507. Appellant's reference to *Moran* is passing at best when it states, "One of the key aspects of this implied promise is that 'neither party shall do anything [that] will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' *Moran v. Erk*, 11 N.Y.3d 452, 456 (N.Y. 2008)."

Looking to the specifics of the *Moran* analysis that Appellant fleetingly invokes, we conclude that it does not apply here. Again, *ThreeSixty* described the analysis mandated by *Moran* as

> requir[ing] the court to use the law applicable in all contract cases to determine the meaning of a contract term and then, after looking at both that term in isolation and the contract as a whole, to decide (1) whether

46

the covenant would negate the terms of the bargained-for clause; and (2) if not, whether application of the covenant is necessary to preserve the fruits of the contract and prevent it from being illusory.

*ThreeSixty*, 520 F. Supp. 3d at 507. To follow the path marked by *ThreeSixty*, (1) Section 12.2 vests Macquarie with "final and conclusive" discretion to make decisions such as those regarding whether to consent to prepayment of the Mezzanine Loan; (2) it would be a direct contradiction to the language of Section 12.2 to overlay on it the duty of good faith and fair dealing on that Section—imposition of the duty would negate the terms of the provision vesting the Lender with broad-ranging discretion; and (3) even if our analysis in step 2 is incorrect, Appellant is not deprived of the fruits of the contract unless the duty is imposed on the Lender when deciding whether to grant consent. Appellant had obtained the fruits of the contract when the financing was provided by the Lender. The consequence of Macquarie's act was to increase the interest rate—an act that had a substantial financial impact on Appellant but was not one that made Macquarie's performance of the Loan Agreement illusory. To accept an argument that *Moran* negates the discretion vested in the Lender in Section 12.2 would create an exception that swallowed the rule. The discretion created by Section 12.2 would be read out of the agreement when Appellant had obtained the lion's share of the performance required by Macquarie but disagreed with how Macquarie resolved the question of whether prepayment of the Mezzanine Loan affected its position and prompted it to charge a post-default interest rate.

At bottom, we conclude that Section 12.2 of the Loan Agreement vests sufficient discretion in Macquarie to negate a duty of good faith and fair dealing in deciding whether to consent to prepayment of the Mezzanine Loan. Under the circumstances of this case, the *Moran* analysis—that permits imposition of the duty even though sole discretion is vested to make the decision in question—does not apply.

We overrule Appellant's Issue 1.d.

### G. We accept Appellant's argument that the Loan Agreement does not permit Macquarie to recover its attorneys' fees and expenses from Appellant.

In its second issue, Appellant attacks the trial court's award of approximately $1.5 million in attorneys' fees to Macquarie. Appellant does not challenge the evidence that Macquarie offered to support the amount or the reasonableness of its attorneys' fees. But Appellant makes a more fundamental attack: Appellant in its Issue 2.a. asserts that no provision of the Loan Agreement permits Macquarie to recover its fees and that the existence of such a provision is a prerequisite to a fee recovery under New York law.[10] Appellant underpins its argument with the contention that the provision of the Loan Agreement that Macquarie relied on in the trial court to obtain its fee recovery, when properly interpreted under New York law, provides no basis for Macquarie to shift its attorneys' fees to Appellant. In Appellant's view, the provision addresses indemnity, and though under New York law

---

[10]Our holdings obviate the need to address Appellant's 2.b.(1) regarding whether Appellant did not oppose a request for attorneys' fees as raised in Macquarie's motion for summary judgment.

48

an indemnity provision may sometimes support an interparty fee claim, the provision relied on by Macquarie lacks the necessary clarity to accomplish that result. We agree with Appellant. But we first turn to Macquarie's argument that Appellant waived its right to contest the fee recovery.

**1.    As a preliminary matter, we do not agree with Macquarie that Appellant has waived its argument that Macquarie cannot recover its attorneys' fees.**

Macquarie argues that Appellant has waived the issue of attorneys' fees on appeal by not challenging the ground raised in Macquarie's motion for summary judgment—that the Loan Agreement permitted it to recover its fees. Macquarie argues that its motion for summary judgment provided fair notice that one of the motion's grounds was that it was entitled to recover its attorneys' fees. We reject the waiver argument because Appellant filed a motion to reconsider whether the Loan Agreement entitled Macquarie to recover its attorneys' fees, and the trial court considered and ruled on that motion. Appellant raises an issue on appeal challenging the ruling on that motion. The ruling on the motion to reconsider and the issue challenging that ruling adequately postures the fee issue for our review. Further, Macquarie carried the burden to establish its fee claim on summary judgment as a matter of law; Appellant's alleged failure in the trial court to challenge that the claim for attorneys' fees was legally deficient does not free Macquarie from showing on appeal that it was entitled to that relief as a matter of law, i.e., Macquarie is not

49

entitled to a summary judgment by default simply because Appellant did not respond to one of Macquarie's summary-judgment grounds.

When Macquarie filed its motion seeking fees after the trial court had granted Macquarie's motion for summary judgment, Appellant responded by arguing that the summary-judgment motion did not state a ground for the recovery of attorneys' fees. But Appellant's pleading also sought reconsideration of that ruling if the trial court determined that Macquarie's motion had raised that ground. The order granting Macquarie's fee motion dealt with the motion to reconsider as follows:

> Macquarie moved for summary judgment on its entitlement to fees and expenses under [Section] 12.13 of the Loan Agreement on pages five through six of its Motion for Summary Judgment. Specifically, Macquarie asked the court to order that it "is entitled to recover all of its fees and expenses, including expert expenses, under the terms of the parties' Loan Agreement"—namely, [Section] 12.13(a). [Appellant] acknowledged Macquarie's argument[] but did not oppose it on the merits. The [c]ourt then granted Macquarie's motion. Macquarie's instant motion, and the subject of this order, is to determine the amount [of] fees and expenses Macquarie should be awarded.
>
> *[Appellant] has asked the [c]ourt to reconsider its ruling on summary judgment that Macquarie is entitled to recover fees and expenses. The [c]ourt declines to do so, primarily because its ruling on summary judgment was correct: Section 12.13 of the Loan Agreement covers claims between the parties.* [Emphasis added.]

Appellant's second issue in Issue 2.b.(2) questions "whether the [t]rial [c]ourt erred as a matter of law in denying [Appellant's] motion for reconsideration on this issue."

When confronted with a motion to reconsider a summary judgment, the trial court has two options—disregard it or rule on its merits. If the trial court takes the

50

latter course, the ruling on reconsideration may be reviewed on appeal. As the

San Antonio Court of Appeals has explained,

> When a motion for new trial is filed after the rendition of summary judgment, "a trial court has the discretion to consider the grounds in a post-judgment motion and supporting proof[] and reaffirm its summary judgment based on the entire record." Timothy Patton, Summary Judgments in Texas § 7.06[1] (3d ed. 2012); *see also Auten v. DJ Clark, Inc.*, 209 S.W.3d 695, 702 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court also has the discretion to simply deny a motion filed after the entry of summary judgment without considering its substance. *First Gibraltar Bank, FSB v. Farley*, 895 S.W.2d 425, 430 (Tex. App.—San Antonio 1995, writ denied). In the latter situation, an appellate court need only consider arguments and evidence presented prior to the summary-judgment hearing. Timothy Patton, Summary Judgments in Texas § 7.06[1] (3d ed. 2012); *see also Laurel v. Herschap*, 5 S.W.3d 799, 802 (Tex. App.—San Antonio 1999, no pet.). "Thus, the efficacy of a post-judgment motion to preserve a complaint for appellate review depends upon whether the trial court affirmatively considers the new grounds and proof as memorialized by a written order." Timothy Patton, Summary Judgments in Texas § 7.06[1] (3d ed. 2012) (citing *Auten*, 209 S.W.3d at 701; *Stephens v. Dolcefino*, 126 S.W.3d 120, 133–34 (Tex. App.—Houston [1st Dist.] 2003[), *pet. denied*, 181 S.W.3d 741 (Tex. 2005)]).

*Charbonnet v. Shami*, No. 04-12-00711-CV, 2013 WL 2645720, at *5 (Tex. App.—

San Antonio June 12, 2013, pet. denied) (mem. op.); *see also Bauer v. Gulshan Enters.,*

*Inc.*, 617 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on

reh'g) ("When, as here, however, the trial court's order affirmatively states that it

considered the evidence attached to a motion to reconsider, we review the summary

judgment based on the grounds and proof in both the prejudgment and post-judgment

filings."); *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 729–30 (Tex. App.—San

Antonio 2014, pet. denied) (applying the rule in *Charbonnet* to a motion to reconsider

filed with respect to a summary-judgment ruling and stating that when "the trial court affirmatively indicates on the record that it accepted or considered the evidence attached to a motion to reconsider, this court reviews 'the summary judgment based upon the grounds and proof in both prejudgment and post-judgment filings'").

As we read the trial court's order, though the trial court denied Appellant's motion to reconsider, it did consider the motion and reaffirm its ruling by noting that Appellant had filed a motion to reconsider but that "[t]he [c]ourt decline[d] to [reconsider its ruling], primarily because its ruling on summary judgment was correct: Section 12.13 of the Loan Agreement covers claims between the parties." The import of this sentence is that the trial court had considered Appellant's arguments on whether the Loan Agreement provided for the recovery of attorneys' fees and rejected those arguments. Simply on the issue of whether Appellant has preserved its argument on the fee issue for appeal, Appellant's motion in combination with the trial court's ruling convinces us that it has. Our holding comports with our duty to act liberally in determining whether an issue is preserved for appellate review. *See, e.g.*, *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008) ("Like all other procedural rules, those regarding the specificity of post-trial objections should be construed liberally so that the right to appeal is not lost unnecessarily.").

Further, if Macquarie did raise in its summary-judgment motion the ground that it was entitled to recover its fees, it bore the burden to establish that claim as a matter of law. *See* Tex. R. Civ. P. 166a. Even if Appellant failed to challenge that

ground in its response, it still retained the ability on appeal to challenge whether

Macquarie established its fee claim as a matter of law—one aspect of which is whether

the Loan Agreement provided for the recovery of fees. Simply,

> a non[]movant who fails to raise any issues in response to a summary[-]
> judgment motion may still challenge, on appeal, the legal sufficiency of
> the grounds presented by the movant. The nonmovant has no burden
> to respond to a summary[-]judgment motion unless the movant
> conclusively establishes its cause of action or defense. The trial court
> may not grant summary judgment by default because the nonmovant did
> not respond to the summary[-]judgment motion when the movant's
> summary[-]judgment proof is legally insufficient.

*Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 512 (Tex. 2014)

(internal citation and quotation marks omitted) (quoting *Rhone–Poulenc, Inc. v. Steel*, 997

S.W.2d 217, 222–23 (Tex. 1999)). Thus, the failure to challenge the ground by which

Macquarie sought its fees does not foreclose Appellant's argument that Macquarie

failed to establish that ground as a matter of law.

### 2. We set out the principles enunciated by New York courts[11] to determine whether an indemnity provision permits an interparty fee recovery.

The parties agree that the bellwether opinion of the New York Court of

Appeals on the question of whether the Loan Agreement has a provision that permits

---

[11]Macquarie predicated its claim for fees on the Loan Agreement. Thus, the Agreement's choice of law provision selecting New York law governs. *Midwest Med. Supply Co. v. Wingert*, 317 S.W.3d 530, 537 (Tex. App.—Dallas 2010, no pet.) ("A claim for attorneys' fees for breach of contract is not an independent cause of action. We have recognized that the recovery of attorneys' fees for breach of a contract is a substantive, not a procedural, issue and will be governed by the law governing the substantive issues.").

Macquarie's fee recovery is *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903 (N.Y. 1989). *Hooper* stated the general rule of fee recovery as "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute[,] or court rule." *Id.* at 904. *Hooper* then examined the question of whether a hold-harmless provision that permitted the recovery of fees "is limited to attorney's fees incurred by plaintiff in actions involving third parties or also includes those incurred in prosecuting a suit against defendant for claims under the contract." *Id.*

Noting that a contract had to be read in view of "the particular object [that] the parties had in view" and that this principle had special sway for indemnity contracts, *Hooper* held that "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty [that] the parties did not intend to be assumed." *Id.* at 905. To ensure that the language of an indemnity/hold-harmless provision was not expanded to permit loose language in the provision to swallow the rule restricting the recovery of fees, *Hooper* articulated the following interpretive principle for resolving the question of whether an indemnity/hold-harmless provision embraced an interparty fee claim:

> Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise[.]

54

*Id.*

*Hooper* concluded that the indemnity provisions that it had reviewed did not include interparty fee claims because "[n]one are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* *Hooper* buttressed its holding that the indemnity/hold-harmless provisions did not embrace interparty fee claims by noting that several of the contract's other provisions provided for matters such as notice that the claim was being made and an assumption of defense; *Hooper* concluded that these provisions would be surplusage if read to extend "the indemnification clause to require defendant to reimburse plaintiff for attorney's fees in the breach[-]of[-]contract action against defendant." *Id.*

A later New York Court of Appeals decision distilled *Hooper*'s holding and concluded that the following contract provision did not exhibit the necessary clarity to permit an interparty fee recovery when it provided for reimbursement of "charges, fees, costs[,] and expenses[,] . . . including reasonable attorneys' . . . fees and expenses, in connection with . . . the enforcement, defense[,] or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring[,] or participating in any litigation or proceeding . . . relating to any of the Operative Documents." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1180 (N.Y. 2018). The provision failed to satisfy the clarity required by *Hooper* because "the subjects set forth in this provision are all 'susceptible to third-party

claims,' and '[n]one are exclusively or unequivocally referable to claims between the parties themselves' . . . . Accordingly, there is no unmistakable promise to reimburse attorneys' fees in a case brought by" the party entitled to reimbursement under the quoted contractual provision. *Id.* at 1186 (quoting *Hooper*, 548 N.E.2d at 905).

Not unexpectedly, the devil lies in the details of when a provision unequivocally refers to an interparty fee recovery. The premises used by different courts to assess the clarity needed by a provision have not, in our view, been totally consistent. One court emphasized that "the requirement that parties express their intent with 'unmistakable clarity' is not the same as a 'magic words' test, and courts have interpreted indemnification provisions to cover litigation expenses between the parties even where that coverage was not explicitly mandated in such words but, nonetheless, the intent was clear." *Carbonyx License & Lease LLC v. Carbonyx Inc.*, No. 19-cv-1540 (JSR), 2019 WL 6701910, at *8 (S.D.N.Y. Dec. 9, 2019) (mem. order) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178 (2d Cir. 2005)). Another court's approach seemed to come close to establishing that magic words are indeed needed:

> The bottom line is that a contract provision employing the language of third-party claim indemnification may not be read broadly to encompass an award of attorney's fees to the prevailing party based on the other party's breach of the contract; **the provision must explicitly so state. The *Hooper* standard requires more than merely an arguable inference of what the parties must have meant; the intention to authorize an award of fees to the prevailing party in such circumstances must be <u>virtually inescapable</u>.**

*Gotham Partners, L.P. v. High River Ltd. P'ship*, 906 N.Y.S.2d 205, 209 (N.Y. App. Div. 2010) (bolded and underlined emphasis added).

Certain New York courts adopt a seemingly hybrid approach that relies on contextual clues to augment the textual analysis. One court summarized this approach as follows:

> In applying this standard of unmistakable clarity, the courts have generally declined to infer indemnification obligations arising from an indemnitee/indemnitor suit if the contractual language does not expressly refer to or explicitly contemplate such circumstances and the context does not suggest that the contracting parties were specifically concerned with prospective litigation between themselves.

*Luna v. Am. Airlines*, 769 F. Supp. 2d 231, 244 (S.D.N.Y. 2011); *see also Thor 725 8th Ave. LLC v. Goonetilleke*, No. 14 CIV. 4968 (PAE), 2015 WL 8784211, at *4 (S.D.N.Y. Dec. 15, 2015) (opinion and order) (following and applying *Luna* test); *Shah v. 20 E. 64th St., LLC*, 154 N.Y.S.3d 6, 21 (N.Y. App. Div. 2021) (holding that indemnity provision included interparty fee claim because of highly inclusive language in provision and no other provision of agreement would be rendered meaningless if provision read to include interparty claims).

*Luna* cataloged the contextual clues that guided its analysis:

> When an indemnification agreement contains provisions that appear to be inapplicable to suits between the contracting parties—such as requiring that notice of a claim be given to the indemnitor or allowing the indemnitor to assume the indemnitee's defense—the courts have concluded that the contract does not evidence an unmistakably clear intent to indemnify attorney's fees incurred in a lawsuit between the contracting parties.

In contrast, when the language of an indemnification provision specifically evidences the parties' intent to cover claims by contracting parties, indemnification for suits against the indemnitor will be enforced. For instance, when confronted with indemnification provisions that include both broad indemnity clauses and narrower clauses that specifically target third-party claims, courts have determined that the broad provisions cover claims between the contracting parties, thereby ensuring that neither clause is superfluous.

Absent specific contractual language authorizing indemnification in suits between the contracting parties, the courts may still determine that the parties intended for such indemnification based on clear contextual evidence. Thus[,] the court will enforce such an obligation if it is apparent that at the time of contracting the parties had no reason to anticipate the possibility of the indemnitee being faced with third-party claims. . . .

By comparison, if third-party claims were possible at the time of contracting and the contractual language did not evidence the parties' intent regarding the indemnification of attorney's fees incurred in suits between them, the courts have refused to award such expenses as indemnification.

769 F. Supp. 2d at 244–45 (citations omitted).

### 3. We set forth the provision of the Loan Agreement that Macquarie relies on to support its fee claim.

Macquarie predicates its fee claim on a single provision of the Loan Agreement. It relies on Section 12.13 that is titled "Expenses; Indemnity." This section contains six subsections, but Macquarie relies on only one of them. Placing the operative subsection, which we have italicized below, in context with the introductory and concluding clauses of the section, the provision reads as follows:

Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by

58

Lender in connection with . . . *(v) enforcing or preserving any rights, in response to third[-]party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under[,] or affecting Borrower, any other Borrower Party[,] or any Affiliate of Borrower, this Agreement, the other Loan Documents, the Property, the Other Collateral[,] or any other security given for the Loan . . .* provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud[,] or willful misconduct of Lender. [Emphasis added.]

Our focus is on this provision alone; neither party points us to any other provisions of the Loan Agreement that might create the contextual clues that we have enumerated from *Luna*.

### 4. We agree with Appellant that Section 12.13 does not entitle Macquarie to recover its fees for prosecuting and defending its claims against Appellant.

We agree with Appellant that Section 12.13 lacks the clarity that it needs to support an interparty fee claim. Though there is an arguable interpretation of the section that supports the reading advocated for by Macquarie, that reading does not meet the standard articulated by New York's court of last resort that the reference be "exclusively or unequivocally referable to claims between the parties themselves." *See Hooper*, 548 N.E.2d at 905.

Before explaining our rationale, we detail one of Appellant's arguments that we reject. Appellant places great emphasis on the fact that the Loan Agreement does not contain a standard fee provision that might look familiar to Texas lawyers. But that argument begs the question because the question is not what the Loan Agreement did not include but whether the section that it did include satisfies the *Hooper* standard.

59

And, again, neither party mentions the *Luna* principles that look to various textual clues to clarify the scope of the fee provision. The parties do not point us to provisions of the Loan Agreement that would be rendered surplusage or suggest that it would be "apparent that at the time of contracting the parties had no reason to anticipate the possibility of the indemnitee being faced with third-party claims." *See Luna*, 769 F. Supp. 2d at 244.

Here, the argument focuses on whether subsection (a)(v) of Section 12.13 covers both third-party and interparty claims. This argument is crystalized in Macquarie's brief as follows:

> Here too, [Section] 12.13 of the Loan Agreement distinguishes third-party claims from claims between the parties and must be interpreted as covering both. [Appellant] is correct that [Section] 12.13(a)(v) first addresses costs and expenses incurred in connection with "enforcing or preserving any rights, in response to third[-]party claims." But that same section also covers costs and expenses incurred "*prosecuting or defending* of any action or proceeding or other obligation or otherwise, in each case *against, under*[,] *or affecting Borrower, any other Borrower Party*[,] *or any Affiliate of Borrower,* this Agreement, the other Loan Documents, the Property, the Other Collateral[,] or any other security given for the loan." Section 12.13 of the Loan Agreement therefore covers claims between the parties, and the trial court correctly awarded Macquarie its reasonable attorneys' fees and expenses. *See, e.g., Mid-Hudson Catskill Rural Migrant Ministry . . .* , 418 F.3d [at] 178–79 . . . (distinguishing provision indemnifying a party for certain actions "brought by third parties" from one covering "actions of any kind or nature arising, growing out of, or otherwise connected with any activity under this Agreement"). [Brief and record references omitted.]

Certainly, Section 12.13 describes actions "prosecuting or defending" matters "against . . . or affecting" the borrower, and this suit was such. But the open question

60

is whether the section can be interpreted to include a suit by Macquarie against Appellant simply because a literal interpretation is broad enough to support Macquarie's construction. The phrases Macquarie relies on are pregnant with the possibility that they include such claims but do not carry that possibility to fruition with the necessary clarity to meet the *Hooper* standard; the provision never explicitly states that a suit brought by Macquarie against Appellant falls within its ambit.

Appellant argues, and we agree, that Section 12.13's language parallels the provision examined in *Ambac* that provided for the recovery of "charges, fees, costs[,] and expenses[,] . . . including reasonable attorneys' . . . fees and expenses, in connection with . . . the enforcement, defense[,] or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring[,] or participating in any litigation or proceeding . . . relating to any of the Operative Documents." 106 N.E.3d at 1180. If literally interpreted, this language seems to hold a possible interpretation that would allow an interparty fee recovery. Even so, the New York Court of Appeals found that it failed to carry the unmistakable promise necessary to support that claim. *Id.* at 1186.

Macquarie also places emphasis on the fact that Section 12.13 is broken down into two sections—one dealing with expenses and the other indemnity. Specifically, Macquarie argues,

> [Section] 12.13, which is titled "Expenses; Indemnity" and not just "indemnity[,"] has two parts. Section 12.13(b), which starts with "Borrower shall *indemnify*," is the indemnification provision. Section

61

12.13(a), on the other hand, covers expenses; it requires [Appellant] to pay or reimburse Macquarie for reasonable "costs *and expenses*" incurred, "including reasonable attorneys' fees" incurred in "prosecuting or defending of any action or proceeding . . . against, under[,] or affecting" [Appellant]. [Record references omitted.]

But, again, *Ambac* had a provision that was also phrased in terms of reimbursement but still applied the rule of *Hooper* to conclude that the provision lacked the necessary clarity. *Id.* at 1180, 1186. Thus, the court of last resort in New York does not appear to see the material distinction advocated for by Macquarie simply because the provision deals with reimbursement.

We sustain Appellant's Issue 2.a. and hold as a matter of law that Macquarie cannot recover its attorneys' fees and expenses from Appellant because Section 12.13 cannot be interpreted as having the necessary clarity to create that claim. *See id.* For the same reason, we also sustain Appellant's Issue 2.b.(2), in which Appellant contends that the trial court erred by denying its motion for reconsideration on the issue of Macquarie's ability to recover attorneys' fees.

## IV. Conclusion

We have overruled the portions of Appellant's first issue that challenge the trial court's grant of summary judgment that Appellant recover nothing on its claims that Macquarie breached the Loan Agreement by declaring a default because the Mezzanine Loan was prepaid without its written consent and that Macquarie owed Appellant a duty of good faith and fair dealing. We have also concluded that Appellant has waived the portion of its first issue claiming that a fact question exists

regarding whether Macquarie consented to the prepayment of the Mezzanine Loan. Our resolution of these issues obviates the need to address whether Appellant also defaulted on the Loan Agreement by its exercise of a parking-lot option or whether Macquarie's public statements that the loan was in default devalued the hotel. Thus, we affirm the portion of the trial court's judgment that Appellant recover nothing on its claims against Macquarie. However, we hold that there is an error in the trial court's judgment because having sustained Appellant's second issue, we reverse the trial court's judgment awarding Macquarie its attorneys' fees and expenses; Section 12.13 of the Loan Agreement cannot be read as having the requisite clarity to entitle Macquarie to that recovery. Accordingly, we render judgment that Macquarie take nothing on its fee claim.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 31, 2022